**Marty Lee ROE, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee**

**2013–SC–000793–MR**

Supreme Court of Kentucky.

RENDERED: SEPTEMBER 24, 2015

REHEARING DENIED MAY 5, 2016

MODIFIED: MAY 5, 2016

Counsel for Appellant: John Gerhart Landon, Assistant Public Advocate, Department of Public Advocacy.

Counsel for Appellee: Andy Beshear, Attorney General of Kentucky, Leilani K.M. Martin, Assistant Attorney General.

## MEMORANDUM OPINION OF THE COURT

A circuit court jury convicted Marty Roe of murdering Martha Post, tampering with physical evidence, and harassing communications, a misdemeanor charge. Roe was sentenced to life imprisonment. On appeal to this Court as a matter of right,[1] he raises a host of trial errors that allegedly rendered the judgment entered against him fundamentally unfair. We find no error at trial and affirm the judgment.[2]

## I. FACTUAL AND PROCEDURAL BACKGROUND

At the end of her workday, Martha Post, a dermatologist, left the building that housed her medical practice, Commonwealth Dermatology ("ComDerm"), as well as her husband's internal-medicine practice; stepped into her van; and started the engine. As she sat there, parked in the grass next to the building, security cameras reveal that a man approached her van. After a brief exchange of words, the man fired three gunshots into the van and fled the scene. Post suffered gunshot wounds to the neck, left thigh, and chest. The chest wound was fatal.

Immediately after the shooting, as Post was succumbing to her injuries, her van rolled into a nearby parking lot, where it collided with a vehicle driven by Sandra Schroeder. Schroeder had noticed Post's van nearby and observed that she was engaging in conversation with a man standing by the driver's side window. She characterized the man as a "landscaper" because of his attire and the van's location on the grass. She could not identify that man, but investigators later determined that man was Marty Roe.

Roe was a long-time acquaintance of Post and her family. Roe and Post had met some four years before the murder when he was an assistant on a remodeling project at ComDerm. Roe was homeless at the time, and Post agreed to let him live in the basement of ComDerm, where he began working as the building's handyman the next few years. While living at ComDerm, Roe became familiar with Post's family, including her husband, Robert Truitt, an internal medicine physician, and their three daughters. Roe even attended family functions and holiday celebrations. But the amicable relationship between Roe and the Post–Truitt family derailed when Roe began expressing romantic feelings for Post.

About a year before the murder, Roe was fired and evicted from ComDerm. This occurred for a number of reasons, but primarily because of his progressively erratic behavior and his obsession with Post. Even after his eviction, Roe believed that

---

**1.** Ky. Const. § 110(2)(b).

**2.** We issued an opinion in this matter on September 24, 2016. Upon further review pursuant to Appellant's motion, we render this modified opinion.

he would eventually achieve a romantic relationship with Post. He continued to send her gifts; repeatedly called her cell phone; and began leaving her increasingly bizarre messages, some of which contained violent or threatening undertones. About ten months before the murder, Post took recordings of messages she received from Roe to the county attorney's office and filed a criminal complaint against Roe for harassing communications because of the intrusive frequency and threatening nature of their contents. Contact between Roe and Post then ceased for about eight months.

After Post banished him from Com-Derm, Roe bought a van and moved to Ohio. His first return trips back into Kentucky began shortly before the murder, around the time that Post began receiving repeated phone calls and messages from him again. Roe says he went to Kentucky to visit his daughters in attempt to give one of them his van. On the afternoon of Post's murder, Roe was spotted at a bar near the ComDerm facilities. Receipts show that in the days following the murder, Roe made a sojourn into east Tennessee, where he stayed for a while before returning to Ohio.

Law enforcement arrested Roe in Ohio. When searching his van, officers found a handgun wrapped in plastic lodged under the hood. A DNA analysis found Roe's DNA on the gun, along with one other partial profile of an unknown individual. A ballistic analysis of the shell casings confirmed that this gun was the same one used to kill Post.

Roe was charged with Post's murder, felony tampering with physical evidence, and misdemeanor harassing communications. At trial, he presented an alternate-perpetrator theory of defense, suggesting that Post's husband, Truitt, played a role in his wife's death, perhaps by engaging the services of a contract killer. The jury ultimately found Roe guilty on all three counts, sentencing him to life imprisonment for murder, five years for tampering with physical evidence, and ninety days for harassing communications, to run consecutively. Recognizing that a term of years' sentence may not run consecutively with a life sentence, the trial court ordered his sentences to run concurrently.[3]

## II. ANALYSIS.

Roe's appeal presents seven allegations of error: (1) the trial court allowed improper and prejudicial opinion testimony from witnesses with no personal knowledge, (2) the trial court allowed prejudicial victim-impact evidence during the guilt phase of Roe's trial, (3) Roe's right to present a defense was violated when the trial court excluded evidence crucial to Roe's alternate-perpetrator theory, (4) a violation of *Batson v. Kentucky*[4] occurred during jury selection, (5) the trial court erred in sentencing Roe without the benefit of a PreSentence Investigation (PSI) Report, (6) cumulative error, and (7) the trial court inappropriately imposed court costs. We will address each of these issues in turn.

 The issues presented are largely unpreserved below, and we will employ two separate standards of review. For non-constitutional issues preserved at trial, we will review the evidence for whether an error substantially sways the judgment.[5]

---

**3.** *See Yarnell v. Commonwealth,* 833 S.W.2d 834, 838 (Ky.1992).

**4.** 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**5.** *See Winstead v. Commonwealth,* 283 S.W.3d 678, 688–89 (Ky.2009).

The test is not "whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence."[6] As for unpreserved issues, Kentucky Rules of Criminal Procedure (RCr) 10.26 authorizes us to reverse the trial court only upon a finding of "manifest injustice."[7] This occurs when "the error so seriously affected the fairness, integrity, or public reputation of the proceeding as to be 'shocking or jurisprudentially intolerable.'"[8]

## A. The Trial Court Did Not Allow Improper Opinion Testimony.

During the Commonwealth's case-in-chief, members of Post's family and work associates were called to testify to their knowledge of the relationship between Roe and Post. The witnesses all testified that Roe had sent Post frequent and disturbing messages and that after learning of her death, they instantly "thought of" Roe. But Roe's counsel never objected to this specific evidence at trial and, as such, failed to preserve this issue for our review. Nevertheless, Roe asks us to review the testimony below for palpable error under RCr 10.26. He primarily claims that the testimony was both irrelevant to his guilt and improper opinion testimony from lay witnesses who lacked personal knowledge. Roe does present a persuasive argument as to the relevance of this particular testimony, but because he failed to object at trial, we will not reverse absent a conclusion that the identification testimony rendered his trial manifestly unjust.

■ The Kentucky Rules of Evidence (KRE) state that evidence is relevant if it has "any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[9] This standard is powerfully inclusionary and is met upon a showing of minimal probativeness.[10] As for opinion testimony from lay witnesses, such evidence is permitted so long as the opinions are rationally related to the witness's perceptions; helpful to an understanding of the testimony or determination of a fact in issue; and not based on scientific, technical, or specialized knowledge.[11]

This issue centers on the testimony of five witnesses: (1) Post's sister, Elizabeth Post; two of Post's daughters, (2) Caitlyn Truitt and (3) Erin Truitt; (4) her husband, Robert Truitt; and (5) former employee, Sara Smith. All five witnesses knew both Post and Roe, and each had an understanding of Roe's romantic infatuation with Post. They testified to their knowledge of Roe's persistent contact with Post and were asked to describe their thoughts upon learning of Post's murder:

6. *Id.* (quoting *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

7. ("A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that a manifest injustice has resulted from the error.").

8. *Commonwealth v. Jones,* 283 S.W.3d 665, 668 (Ky.2009) (quoting *Martin v. Commonwealth,* 207 S.W.3d 1, 4 (Ky.2006)).

9. KRE 401.

10. *See* LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK § 2.05(2)(b) (LexisNexis Matthew Bender) ("The inclusionary thrust of the law of evidence is powerful, unmistakable, and undeniable, one that strongly tilts outcomes toward admission of evidence rather than exclusion.").

11. KRE 701.

Because Roe's counsel only preserved certain pieces of each witness's testimony, we will review excerpts of each witness's statements individually.

## 1. Elizabeth Post.

 Elizabeth Post came to the crime scene the evening that Post was murdered and spoke with police as they were conducting their investigation. The Commonwealth called her to testify about her observations that night and her impressions hours after the shooting. Post had told Elizabeth about Roe's incessant communications, which Elizabeth termed "creepy and haunting." She testified that police asked her if she knew of anyone who would want to harm Post, and Roe instantly came to her mind. Elizabeth went on to say that Truitt arrived at the scene where he commented, "Well, he did it, he finally did it." Roe's counsel only objected to Elizabeth's characterization of the text messages Post received from Roe and, therefore, leaves any review of the rest of the testimony unpreserved.

We see no palpable error in the trial court's admitting Elizabeth's testimony. Because Elizabeth had been apprised of the situation by Post and had knowledge of Roe's messages, this testimony appears to be a classic use of her own impressions of the situation. Her identification of Roe as the only person she envisioned who would wish Post harm is similarly a mere reflection of her state of mind at the crime scene based on her personal knowledge of Post and Roe. We cannot conclude this gives rise to palpable error.

As for Elizabeth's recitation of Truitt's statement at the crime scene, Roe is correct that this is hearsay. But we view this testimony as a classic example of present-sense impression: an exception to the hearsay rule for statements made while perceiving an event or condition, or immediately thereafter.[12] Truitt had just arrived at the location where his wife had been brutally murdered, and his statement was made as he was grappling with the situation. Although hearsay and accusatory in nature, the statement reflects Truitt's initial impression of the circumstances. The trial court did not err by admitting Elizabeth's testimony on this point.

## 2. Caitlyn Truitt.

 Caitlyn Truitt, Post's daughter, testified to her thoughts and impressions when she learned of her mother's murder. At the time of the crime, Caitlyn lived out of state. Roe's counsel objected to testimony from Caitlyn that she had a "miasma" of fear for Roe and her characterization that Roe is a "bad guy." The trial court sustained both objections. The testimony continued, and Caitlyn informed the jury that her mother showed her numerous phone numbers that were labeled "Marty" to designate various attempts Roe made to contact Post. When asked about her reaction to the news of the murder, Caitlyn described her reaction as "at first it was just panic ... and then my first thought when I heard she was dead is I thought of Marty." Caitlyn said her family feared Roe for over a year and that she feared for both her mother and father. Roe failed to preserve his objection to any of this testimony.

Similar to Elizabeth's testimony, Caitlyn corroborated the family's fear of Roe because of his relentless efforts to contact Post. Her immediate thought of Roe when learning of the murder is simply perception-based testimony derived from her own personal knowledge of the situation. It

**12.** KRE 803(1).

simply represents a mental response to new information, based on a pre-existing fear she had of Roe. Caitlyn did not offer improper opinion in the form of, "I think Marty did it" but, instead, testified that his name immediately popped into her head. This again does not render Roe's trial manifestly unjust, so there was no palpable error.

### 3. Erin Truitt

Erin Truitt, Post's daughter, testified that Post played for her some of the voicemail messages Roe left for Post. She was also asked to describe her thoughts after learning of her mother's death. Erin first said she was shocked and then wished it was simply a stray bullet. Eventually, her thoughts focused on Roe. Roe's counsel did not object to this testimony that Erin thought of Roe in her initial impression of the crime.

We find no palpable error in allowing this testimony. The examination established that Erin was apprised of the communications between Roe and Post, and she corroborated the fear the family had of Roe. Moreover, allowing Erin to testify to her perceptions immediately after learning the news of the murder was not a palpable error. There was no manifest injustice in declining to exclude this evidence.

### 4. Robert Truitt

Continuing the theme, Robert Truitt, Post's husband, testified to his thoughts immediately after learning of the murder. He testified that "his worst fear was realized," that fear being that "Marty would eventually ambush her and kill her . . . ." He said he called Caitlyn after hearing the news and told her "that her mother had been killed, just like we were fearing." For reasons stated above regarding present-sense impression testimony, this was properly admitted at trial.

Perhaps the most contentious aspect of Truitt's testimony came when he was asked to explain why he asked police if Post had been shot. He responded, "Because that's what I thought Marty would do. I thought he was too cowardly to use any other method. He wasn't going to stab her. He wasn't going to strangle her. He was gonna shoot her." Roe's counsel objected to the statement and moved for a mistrial. The trial judge denied the mistrial, but sustained the objection and admonished the jury not to consider the comment. The trial judge's ruling here was not in error. Truitt's testimony here was not a present-sense impression; rather, it was an opinion based not on personal knowledge, but pure emotion. But a mistrial is available only for a "manifest necessity." [13] Here, we have no reason to doubt the jury's ability to follow the trial court's curative admonition, which was the proper recourse for Truitt's inadmissible testimony. [14] As such, the trial court did not err when it denied Roe's motion for mistrial at this juncture.

### 5. Sara Smith

The last testimony Roe presents for review was the Commonwealth's cross-examination of Sara Smith, a physician and colleague of Post's, who was primarily a defense witness at trial. She confirmed that Truitt encouraged Post to take out more life insurance, and she corroborated that Truitt made statements about wanting violent retribution if the police did not kill

---

13. *Nunley v. Commonwealth*, 393 S.W.3d 9, 13 (Ky.2014).

14. *See Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky.2003) ("A jury is presumed to follow an admonition to disregard evidence and the admonition thus cures any error.").

Roe. On cross-examination, the Commonwealth asked Smith if there was any doubt in her mind who Truitt thought killed his wife. She responded in the negative. Finally, the Commonwealth asked her if the name Marty Roe went through her mind when she heard of the murder. She responded, "Yes, sir, it did." Roe's counsel failed to preserve these elements of the Commonwealth's cross-examination for our review.

Despite Smith's primary utility as a defense witness, Roe asks us to review inclusion of these two statements for palpable error. Like the witnesses discussed above, Roe presents a persuasive argument as to the relevancy of this questioning. But Roe failed to object to this at trial to preserve the issue. Because of the overwhelming evidence pointing to Roe's guilt, the trial court allowing the jury to hear this testimony did not result in a manifest injustice. There was no palpable error.

### B. The Commonwealth Did Not Introduce Victim–Impact Evidence during the Guilt Phase of Trial.

During the Commonwealth's presentation of evidence, Post's family members were routinely prodded about their emotional responses to the murder. Post's sister was asked if she cried when she learned of her death. Her daughters described their relationships with their mother and were asked if they missed her. Truitt was asked to describe "the impact of her death" on his life.

Roe argues that this testimony amounted to impermissible victim-impact evidence presented during the criminal-responsibility phase of a trial. He claims that the emotional appeal from this type of evidence unduly influenced the jury. This testimony was admitted without objection, so Roe did not preserve this issue for our review. Nevertheless, he requests palpable error review under RCr 10.26.

The prohibition of victim-impact evidence during the criminal-responsibility phase of trial is deeply rooted in both our precedent and Kentucky statutory law. Under Kentucky Revised Statutes (KRS) 532.055(2)(a)(7), the Commonwealth may introduce evidence, after a determination of guilt, relevant to the impact of the crime upon the victim, including any physical, psychological, or financial harm. We have cautioned against the use of this type of evidence when determining guilt because it is "generally intended to arouse sympathy for the families of the victims" and is "largely irrelevant to the issue of guilt or innocence." [15] We recognize the need to insulate criminal defendants from the overwhelming empathy this evidence can induce; and, accordingly, the rule is intended to prevent emotional convictions.

But the test does not conclude there. Though victim-impact evidence is impermissible in determining guilt, the Commonwealth is "entitled to show the jury that the victim was not a mere statistic, but a living person ..." [16] Indeed, some amount of background evidence may be relevant to understanding the nature of the crime committed.[17] And the Commonwealth has broad discretion "to persuade the jurors the matter should not be dealt

---

15. *Bennett v. Commonwealth,* 978 S.W.2d 322, 324–26 (Ky.1998).

16. *Id. See also Bussell v. Commonwealth,* 882 S.W.2d 111, 113 (Ky.1994) (no error in guilt phase when a relative merely calls attention

to the fact that the victim was once a living person rather than a statistic).

17. *See Bussell,* 882 S.W.2d at 113.

with lightly."[18] The line between relevant-background information and prejudicial-impact testimony is a narrow one; but we essentially distinguish the two forms of testimony by inquiring whether the witness was overly emotional, condemnatory, or accusatory in nature.[19]

After review of the testimony in this case, we cannot determine that admission of the statements reaches the level of palpable error. The characteristics unique to victim-impact information support our conclusion. The testimony Roe highlights tends to establish Post's role as a loving mother and wife rather than any "physical, psychological, or financial" harm her untimely death caused her immediate family. Roe correctly points out that this evidence triggers empathy from the jury. But this is a tragic crime, and *any* background information is likely to stir up emotional testimony. Testimony does not become prejudicial victim-impact evidence simply because it elicits an emotional response from the witness. As such, there was no palpable error in this evidence as presented at trial.

## C. Exclusion Roe's Proffered Aaltperp Evidence Was Not Error.

A critical aspect of Roe's defense was an alternate-perpetrator theory suggesting that Truitt played a role in orchestrating the events culminating in his wife's murder. In support of his aaltperp defense Roe presented evidence that Post had subsidized Truitt's unprofitable internal-medicine practice and that she intended eventually to cut off his funding;[20] that

Post had recently upgraded her life insurance policy, making her husband the beneficiary of the $1.5 million proceeds; that infidelity had occurred in the marriage; and, most importantly, that Truitt made a number of potentially incriminating actions and statements during the investigation of his wife's murder. We need not, however, review each instance Roe provided in his brief. Our role is simply to determine whether the trial court erred by excluding Roe's proffered evidence.

Specifically, Roe complains that his right to present a defense was abridged when the trial court refused to permit testimony of two witnesses and declined his request to play for the jury an audio recording of Truitt's initial interview with police. The first witness, Suzie Castle, worked in Post's office and would have testified to the impending closure of Truitt's internal-medicine practice, thus highlighting Truitt's financial stress; his drinking; and his tardiness in showing up for work. The second witness, Craig Mayfield, was Post's information-technology director. He would have testified that, in addition to the financial strain Truitt's practice placed on Post, Truitt had asked him about the process of encrypting computer hard drives, which he considered an odd question, though Mayfield never did any actual encryption.[21]

Shortly after Post's murder, police interviewed Truitt and recorded his statement. In support of his effort his aaltperp defense, Roe cites to the portion of the interview in which Truitt admits to owning a gun that the police do not know about and

**18.** *Lynem v. Commonwealth,* 565 S.W.2d 141 (Ky.1978).

**19.** *See Foley v. Commonwealth,* 953 S.W.2d 924, 937 (Ky.1997).

**20.** It is established from the evidence that Post had decided to quit subsidizing his prac-

tice; it was not clear that Dr. Truitt was aware of Post's decision.

**21.** Roe seems to suggest that Truitt's inquiry into computer encryption may have been to cover up his marital infidelities.

to knowing a hit man. Roe argues that these admissions showed that Truitt had a method and opportunity to have his wife killed, and the ability to provide the hit man with the weapon to do so. In context, however, it is apparent that if these statements suggest Truitt's inclination to murder, the target of these vague threats was Roe, not his wife. We are not persuaded that the exclusion of this evidence infringed upon Roe's constitutional right to present a defense.[22]

In *Beaty v. Commonwealth*, we held that an aaltperp theory of defense could be admitted with evidence that the alternate perpetrator had both the motive *and* opportunity to commit the crime.[23] Recently, in *Gray v. Commonwealth*, we clarified that evidence of the alternative perpetrator's motive and opportunity was not the only way to establish an aaltperp defense.[24] We explained:

> [T]he critical question for aaltperp evidence is one of relevance: whether the defendant's proffered evidence has any tendency to make the existence of any consequential fact more or less probable. [KRE 401]. And the best tool for assessing the admissibility of aaltperp evidence is the Kentucky Rules of Evidence. Naturally, under the powerfully inclusionary thrust of relevance under these rules, it would appear almost any aaltperp theory would be admissible at trial. But KRE 403 provides the qualification of this evidence we considered necessary in *Beaty*. That rule prompts the trial court to weigh the probative

value of the evidence against the risk of prejudice at trial, including confusing the issues or misleading the jury. [KRE 403]. Essentially, the balancing test found in KRE 403 is the true threshold for admitting aaltperp evidence; *Beaty* and its progeny are simply this Court's way of guiding the trial court in assessing the probative value of prospective aaltperp theories.

KRE 403 is the mechanism by which the trial court exercises its discretion to exclude evidence of "unsupported," "speculative," or "far-fetched" theories that mislead or confuse the jury.[25] We afford considerable discretion to trial-court evidentiary determinations and will reverse only upon a finding of an abuse of discretion. A trial court's ruling will be affirmed absent a showing the decision was arbitrary, unreasonable, unfair, or unsupported by legal principles.[26]

Applying this test, we conclude that the trial judge did not abuse his discretion in refusing to admit these elements of Roe's alternate-perpetrator theory. Roe was able to present to the jury the most probative elements of his defense. He argued this theory in his opening statement and introduced evidence of its essential elements. His defense was not unfairly abridged. The excluded evidence was only marginally relevant and would ultimately have contributed little toward the advancement of his theory. Accordingly, we conclude that the trial court acted well within it discretion in its handling of this issue.

---

**22.** *See Harris v. Commonwealth*, 134 S.W.3d 603, 608 (Ky.2004) (it offends due process to exclude fundamental elements of the defendant's defense, which may include the right to introduce an alternate-perpetrator theory).

**23.** 125 S.W.3d 196 (Ky.2003).

**24.** 480 S.W.3d 253, 267 (Ky.2016).

**25.** *Beaty*, 125 S.W.3d at 207 ("A trial court may infringe upon this right [to introduce aaltperp evidence] when the defense theory is 'unsupported,' 'speculat[ive],' and 'far-fetched' and could thereby confuse or mislead the jury.").

**26.** *See Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).

### D. There Was No *Batson* Violation.

██ Roe next claims that the trial court erred in denying his *Batson* challenge to the Commonwealth's use of a peremptory challenge to Juror 4554. During jury selection, defense counsel asked prospective jurors if it would be worse for an innocent man to go to prison, or for a guilty man to go free. Juror 4554, an African–American female, responded "I think that putting an innocent person in jail is worse than letting a guilty person go ... Because you're taking an innocent person's life." Immediately after this exchange, Juror 4061, a white juror, stated that she "agreed" with Juror 4554 that it was indeed worse to lock up an innocent person than to let a guilty person go free.[27]

After the completion of the voir dire examination of the prospective jurors, the Commonwealth exercised a preemptory challenge to strike Juror 4554. Roe responded by raising an objection under *Batson* to the juror's removal.

Upon consideration of the *Batson* challenge, the trial court noted that although Juror 4554 and Juror 4061 gave substantially the same response to the "which is worse" question, only Juror 4554, the African–American, was struck, while the white juror giving the same answer was not. The prosecutor explained the decision this way:

> I felt [Juror 4554 was] clearly into this 'worse for an innocent man to go to jail than a guilty person go free' .... I sensed a significant defense bias on her

part, and as a result she seemed to ... she and [defense counsel] seemed to ... I don't want to say bond, but they, she seemed to be pretty well swayed by [defense counsel] and believe and I ... I sensed a defense bias and that's the reason I struck her."

After defense counsel disputed this interpretation for Juror 4554's reason for speaking out, the prosecutor continued and explained the reason why Juror 4061 was not struck: "probably because we didn't have enough strikes. That was our other one that we ... that was our next in line. But, this one [Juror 4554] had really identified with [defense counsel.]"

With some hesitation based upon the Commonwealth's vague rationale for challenging Juror 4554, the trial court found that the exercise of the peremptory challenge to remove Juror 4554 was not racially motivated.

In *Batson*, the United States Supreme Court set out a three-step process for trial courts to follow in adjudicating a claim that a peremptory challenge was based on race: First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown

---

**27.** It is worth noting that the views of Jurors 4061 and 4554 are in accordance with an often repeated and widely accepted precept of the American criminal justice system ideal. "It has often been said that our system of criminal justice is founded upon a common law tradition that deems it better that a guilty man go free than an innocent man stand convicted. Justice Harlan expressed this sentiment cogently while concurring in the case

of *In re: Winship*, 397 U.S. 358, 380, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). There he stated 'I view the requirement of proof beyond a reasonable doubt in a criminal case as bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.' " *Commonwealth v. Gruff*, 822 A.2d 773, 783 (Pa.Super.2003) (Bender, J. concurring and dissenting).

purposeful discrimination.[28]

■ Here, the prosecutor used a peremptory challenge to strike an African-American juror, but did not strike the white juror who had given a similar answer. And even though Roe is not African-American, it is well settled that he has standing to raise the issue implicated by the prosecutor's apparently disparate treatment of an African-American juror.[29] This prima facie appearance of racially unequal treatment of Jurors 4554 and 4061 satisfies the first prong of *Batson*.

■ The second prong of *Batson* requires the prosecutor to provide a race-neutral explanation for striking a juror of a protected class.[30] "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral."[31] Here, the Commonwealth offered facially-valid, race-neutral reasons for striking Juror 4554: the juror's apparent affinity for defense counsel left the prosecutor with a feeling that the juror had "a significant defense bias." We do not construe Juror 4554's answer to the "which is better" question as the primary reason for the strike. "[A] trial lawyer's instinct or gut feeling can be the legitimate basis for a race-neutral reason to strike a juror of a protected class, but there must be some articulable, case-related reason attached to it."[32] Here, the Commonwealth articulated such a reason.

■ The final prong of the *Batson* test requires the trial court to assess the plausibility of the prosecutor's explanations in light of all relevant evidence and determine if the proffered reasons are simply pretexts for discrimination.[33] "[T]he trial court's ultimate decision on a *Batson* challenge is akin to a finding of fact, which must be afforded great deference by an appellate court,"[34] and so will not be disturbed "unless clearly erroneous."[35]

With the deference we must accord to the trial court's finding, we are not persuaded that the exclusion of Juror 4554 was racially motivated. We are satisfied that the trial court did not abuse its discretion in this matter, and that no *Batson* violation occurred. But I write separately to emphasize that this decision lays to rest a line of erroneous holdings with relation to standing to raise a *Batson* issue.

The *Batson issue* raised by Appellant, who is white, with respect to Juror 4554, who is African-American, affords us the opportunity to address the cross-racial application of *Batson* which has not been accurately stated in some of our recent cases. *Powers v. Ohio* made clear that *Batson's* scope extends beyond the defendant's race, holding that the Fourteenth Amendment eliminates racial discrimination from all official acts and proceedings of the state in the judicial system.[36] So

28. *Johnson v. Kentucky,* 450 S.W.3d 696, 702 (Ky.2014).

29. *Saylor v. Commonwealth,* 144 S.W.3d 812, 816 (Ky.2004) (citing *Campbell v. Louisiana,* 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998); *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)).

30. *Johnson,* 450 S.W.3d at 702.

31. *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion).

32. *Johnson,* 450 S.W.3d at 705.

33. *Id.* at 706.

34. *Chatman v. Commonwealth,* 241 S.W.3d 799, 804 (Ky.2007).

35. *Washington v. Commonwealth,* 34 S.W.3d 376, 380 (Ky.2000).

36. 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

following *Powers*, a criminal defendant is essentially afforded third-party standing to raise equal-protection claims for jurors the prosecution excludes because of their race.

Admittedly, we have been less than thorough in the implementation of *Powers* into our case law. In the twenty-five years since *Powers* was rendered, this Court has cited the case six times. Among those six, the correct *Batson-Powers* analysis often appears in dissent.[37] But to be sure, we have issued one published opinion that cites the correct standard.[38]

Some of our most recent *Batson* cases continue to invoke the pre-*Powers* rule. In *Blane v. Commonwealth*, we held that a defendant makes a prima facie showing by asserting "that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire *members of the defendant's race*.[39] And in *Johnson v. Commonwealth*, we reaffirmed the prima facie standard of racial identity between the defendant and the excluded juror.[40]

■ Somewhere along the line, the *Powers* exception for third-party standing was overlooked. It is clear to this Court that all a defendant must show in raising a prima facie *Batson* case is an inference of racial discrimination in exercising a challenge to a remove a juror from the venire, which then shifts the burden to the Commonwealth to provide a race-neutral expla-

nation. We fully endorse the protections afforded to criminal defendants in *Powers v. Ohio*.

### E. Roe Waived His PSI Report Rights.

■ Following Roe's conviction, the trial judge ordered a Pre–Sentence Investigation Report. When an officer arrived at Roe's jail cell to obtain a DNA sample, thumbprints, and to conduct the PSI interview, Roe made clear to the officer that he would not cooperate. The officer reported to the trial court that Roe was verbally aggressive and that his physical demeanor matched his verbal aggressiveness. So a detailed PSI report was not fully completed. Despite Roe's noncompliance, the trial court's final judgment reflects that the trial court reviewed the written PSI report and afforded Roe the opportunity to review and correct factual inaccuracies in it. The trial court deemed as waived any further objection by Roe to any incompleteness of the contents of the PSI report.

■ Presentence investigation is a statutory right provided to criminal defendants. KRS 532.050 provides, in relevant part, that:

No court shall impose sentence for conviction of a felony, other than a capital offense, without first ordering a presentence investigation after conviction and giving due consideration to a written

---

37. *See Morgan v. Commonwealth*, 189 S.W.3d 99 (Ky.2006) (Cooper, J., dissenting); *Woodall v. Commonwealth*, 63 S.W.3d 104 (Ky. 2001) (Stumbo, J., dissenting). To be fair, the Court of Appeals has a somewhat better history updating *Powers* to its case law.

38. *See Saylor v. Commonwealth*, 144 S.W.3d 812, 816 (Ky.2004). *See also* the unpublished 2011 opinion *Bennett v. Commonwealth*, 2011 WL 4430862, *7 (Ky.2011).

39. 364 S.W.3d 140, 148–49 (Ky.2012)(emphasis added).

40. *See* 450 S.W.3d 696, 702–703 (Ky.2014) ("Appellant made the requisite initial prima facie showing of racial discrimination necessary for a *Batson* challenge: (1) Appellant is African–American; (2) Juror Fourteen is African–American; (3) the prosecutor struck Juror Fourteen from the jury pool. Nothing more is required to permit an inference of racial discrimination."). *See also Taylor v. Commonwealth*, 2015 WL 5626433 (Ky.2015).

report of the investigation. The presentence investigation report *shall not be waived*; however, the completion of the presentence investigation report may be delayed until after the sentencing upon the written request of the defendant if the defendant is in custody.[41]

The statute further imposes a duty on the trial court to advise defendants or counsel on the contents and conclusions in the PSI report, along with an opportunity to dispute the contents.[42] It, therefore, appears that a trial court has a categorical statutory duty to order a PSI report for all convicted felons and consider the findings before sentencing, unless the defendant petitions for the report post-sentencing in writing. Upon first glance, the statute also suggests that Roe cannot completely waive his rights to a PSI report, contrary to the trial court's determination. But this directly contradicts RCr 11.02(1), which states that "the defendant may waive his presentence investigation report."

Both parties failed to recognize the longstanding constitutional tension between KRS 532.050 and the exceptionally strong separation of powers mandate under the Kentucky Constitution.[43] This prohibition includes legislative attempts to "invade the rule[-]making prerogative of the Supreme Court by legislatively prescribing rules of practice and procedure."[44] We have previously held this precise statute unconstitutional but supported its general principles nevertheless as a gesture of comity to the General Assembly.[45] In so doing, we declared that this Court has the power to preempt the statute by the promulgation of different procedural rules at any time we deem necessary.[46]

Roe argues that despite his aggressive behavior toward the officer attempting to conduct his pre-sentencing interview, the statute does not allow him to waive completely his rights to review of a PSI Report before sentencing, absent a writing. We think otherwise. Recognizing the delicate balance between the desire to honor legislative choices and our own inherent constitutional authority to promulgate rules of court procedure, we have adequately preempted this issue and charged trial judges with the discretion to allow defendants to waive their rights to a PSI Report.[47] Thus, the remaining issue is whether Roe's behavior constitutes a valid waiver of his statutory right.

The appropriate waiver standard applied to this type of right is unclear. In *Alcorn v. Commonwealth*, the defendant urged us to accept an "understanding" standard for waiver of presentencing rights.[48] Having concluded the waiver in that case was "understandingly made," we declined to address the question and establish a standard. Roe's counsel in the sentencing hearing suggested the appropriate standard is if the waiver was "knowing, voluntary, and intelligent," not dissimilar from

---

41. KRS 532.050(1).

42. KRS 532.050(6).

43. Ky. Const. § 28 ("No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted.")

44. *Commonwealth v. Reneer*, 734 S.W.2d 794, 796 (Ky.1987).

45. *Id.* at 798.

46. *Id.*

47. *See Hulett v. Commonwealth*, 834 S.W.2d 688, 692 (Ky.App.1992) (refusing to conclude the trial judge erred by allowing a defendant to waive his PSI Report because of the competing authorities). *See also Alcorn v. Commonwealth*, 557 S.W.2d 624 (Ky.1977).

48. *Alcorn*, 557 S.W.2d at 627.

the standard used for federal constitutional rights articulated in *Miranda v. Arizona*.[49] Though we have avoided setting a standard for waiver of PSI-report rights, we have recognized that statutory rights may be subject to a knowing and voluntary waiver.[50]

In examining the facts of the present case, we see no need to depart from the statutory-rights standard directly above. The officer reported to Roe's cell to conduct the PSI interview, as Roe had been told to expect. Roe had been informed after his conviction that this would occur. Absent a determination that Roe was mentally incapable of understanding the officer, we cannot conclude that the trial court's determination that Roe's behavior represented a manifest intention to waive his right to the report was not unknowing or involuntary. We endorse the Commonwealth's assertion that a court may not impose its will over a defendant, and the trial court has no affirmative duty to reschedule final sentencing to comport to Roe's deliberately noncompliant behavior. The trial court appropriately recognized that Roe is not eligible for probation because of the violent and depraved nature of the crime he committed, so there is no harm in delaying the report. As the statute allows, Roe's PSI report can be completed promptly after sentencing; and he faced no manifest injustice when the trial court proceeded to finally sentence Roe.

## F. There Was No Cumulative Error.

Roe asserts that should we find no error that warrants reversal on its own, we should conclude that the cumulative effect of minor errors renders his trial unfair, mandating a new trial. Because we do not recognize any significant errors at trial, we cannot find cumulative error.[51]

## G. The Trial Court Did Not Err in Ordering Court Costs.

As a final issue presented to us on appeal, both Roe and the Commonwealth agree that the trial court erroneously imposed court costs. The trial court's sentencing order mandated that Roe pay court costs of $155. KRS 23A.205 states that court costs may not be waived unless the court finds that the defendant is a "poor person" under KRS 453.190(2). A *poor person* is defined as a person "who is unable to pay the costs and fees of the proceeding which he is involved without depriving himself or his dependents of the necessities of life, including food, shelter, or clothing."[52]

Both sides concede that Roe is indeed a "poor person" under the terms of the statute, and they both recommend that the court costs be vacated. But this issue has not been preserved for our review. In *Spicer v. Commonwealth*, we clarified that "[i]f a trial judge is not asked at sentencing to determine the defendant's poverty status and did not otherwise presume the defendant to be ... [a] poor person before

**49.** 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**50.** *See Humana, Inc. v. Blose*, 247 S.W.3d 892, 896 (Ky.2008). This was a civil employment law case involving waiver of a statutory right for an employee to sue an employer for a civil rights violation. Writing for the Court, Justice Scott elaborated that there was "no reason why the same principle [of knowing and voluntary waiver] should not apply to the

statutory right of an employee" in a similar fashion to constitutional violations. *Id.*

**51.** *See Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky.2010) ("[W]e have declined to hold that the absence of prejudice plus the absence of prejudice somehow adds up to prejudice.").

**52.** KRS 453.190.

imposing court costs, then there is no error to correct on appeal." [53] A sentencing error only occurs when a defendant's poverty status is clearly established and the trial judge imposes costs contrary to that finding. In the present case, Roe never objected to the imposition of court costs nor did he petition the trial court to evaluate his poverty status. We cannot say the trial court committed a sentencing error when he was never apprised of Roe's inability to pay. So we will not vacate the court costs imposed during sentencing.

### III. CONCLUSION.

For the foregoing reasons, we affirm the judgment of the trial court.

All sitting. All concur.