RENDERED: NOVEMBER 13, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1159-MR

RICHARD MOLETT                                                                                      APPELLANT


APPEAL FROM JEFFERSON CIRCUIT COURT
v.       HONORABLE CHARLES L. CUNNINGHAM, JR., JUDGE
ACTION NO. 12-CI-003928


DARRELL HYCHE                                                                                          APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, JONES, AND KRAMER, JUDGES.

CALDWELL, JUDGE: Richard Molett (Molett) appeals from a Jefferson Circuit Court judgment on a jury verdict in favor of Darrell Hyche (Hyche), a Louisville Metro police officer, on Molett's malicious prosecution claim. We affirm.

## FACTS AND PROCEDURAL HISTORY

In February 2011, Hyche was dispatched to the Kentucky Fair and Exposition Center, where people requested Molett's removal from the site of a children's cheerleading competition. According to Molett, he was at the

competition site to try to deliver sweatpants left behind by a guest of the hotel where he worked and used his cell phone to try to contact the guest. Despite Molett's assertions that he did nothing improper there, some spectators became suspicious when they saw him there alone. Some believed he was taking photographs with his phone or touching himself while watching the competition and reported their concerns to fairgrounds officials and/or event coordinators.

A fairgrounds official directed the switchboard operator to call police and asked security to escort Molett out. With security following him, Molett was outside the building when Hyche and his partner, Officer Dale Hensley (Hensley) arrived. Molett asserts he was leaving voluntarily and was not intoxicated despite having a beer earlier that afternoon.

Hyche asserts that Molett appeared intoxicated and to be heading to cross a busy road on foot. So, Hyche arrested Molett for alcohol intoxication (according to Hyche) and detained him in the police car. When arrested, Molett did not have any sweatpants in his possession. Molett asserts Hyche refused to tell Molett what he was being arrested for, told Hensley that Molett had been "jacking off," and told Molett he knew what he was guilty of and had been caught on tape.

While Hyche waited in the car with Molett, Hensley went inside and spoke to some people. After Hensley came back and relayed what he learned to Hyche, Hyche filled out and filed a uniform citation, listing two witnesses—Amber

Carper (Carper) and Shawna Ratliff (Ratliff) (both mothers of cheerleading competitors). Molett was taken to jail, where he spent the night.

According to the uniform citation, Hyche arrested Molett for alcohol intoxication, criminal trespass, disorderly conduct, and indecent exposure. Prosecutors later amended the indecent exposure charge to first-degree sexual abuse to better fit allegations in the uniform citation that Molett masturbated in the presence of children. (The uniform citation apparently did not contain any factual allegations about Molett exposing his penis, despite its listing indecent exposure as one offense for which Hyche was arrested.)[1]

Later, prosecutors dismissed all charges except for the disorderly conduct charge. Hyche testified at the disorderly conduct trial in November 2011. The jury found Molett not guilty of disorderly conduct.

Molett asserts that he lost his job and experienced long-term unemployment and public humiliation resulting from the fairgrounds incident. He filed suit in 2012, asserting claims including a malicious prosecution claim against Hyche for allegedly initiating criminal proceedings against Molett without

---

[1] The uniform citation (which Molett refers to as Trial Exhibit 2) was not provided to us in the record on appeal, despite Molett's designation of record requesting that all exhibits be included as part of the record on appeal. However, Hyche has not disputed the accuracy of Molett's quotation of the uniform citation in his brief.

probable cause. Following resolution of an earlier appeal in 2018,[2] Molett's malicious prosecution claim against Hyche proceeded to a jury trial in 2019.

At trial, Hyche admitted in testimony that he did not speak with witnesses himself before filling out and filing the uniform citation—instead, he relied on information relayed to him by Hensley. Hensley testified that he spoke with security guards about what parents said and that he also spoke directly with parents. But the two parents listed as witnesses on the arrest citation— Carper and Ratliff—did not recall speaking with police in their testimony.

Hensley did not remember much about the security guards with whom he had spoken. He did not recall talking with security guard Nedra Stikes Cheatham (Cheatham), whose deposition testimony was presented at trial over Molett's objections. Cheatham testified that she had prepared an incident report on the day in question, but she had not communicated with police.

Event coordinator Josh Keeling (Keeling) and fairgrounds security official Christopher Brawner (Brawner) also testified at trial. Molett objected to their testimony, along with Cheatham's on relevancy grounds, as none of these three had been identified as witnesses on the uniform citation. And Molett also

---

[2] *Hyche v. Molett*, No. 2016-CA-000089-MR, No. 2016-CA-001196-MR, and No. 2016-CA-001247-MR, 2018 WL 2187006 (Ky. App. May 11, 2018) (unpublished).

objected to their testimony on hearsay grounds as they recounted various out-of-court statements.

To summarize much of the trial testimony in a nutshell, many complaints about Molett were conveyed from one person to another—like a game of telephone in which the message conveyed was perceived a bit differently each time it was passed along—before being received by police. For example, unspecified people complained to Brawner, who told Keeling of these complaints and asked Keeling to investigate. Keeling then spoke with parents and observed Molett himself before reporting further information to Brawner, and then Brawner directed a switchboard operator to call police.

After the trial court denied Hyche's motion for a directed verdict, it issued its written instructions to the jury. The key instruction informed the jury it could return a verdict in Molett's favor if it found that Hyche acted without probable cause and with malice in initiating criminal proceedings against Molett. The jury sent a question to the trial court, asking it to define the phrase *initiating criminal proceedings* and clarify when this started.

The court went on the record to acknowledge that the question had been brought to the parties' attention. It surmised that the jury recognized that Hyche had more information following Hensley's investigation when Hyche filed the arrest citation than when Hyche initially arrested Molett and detained him in

the police car.  And the court explained that although *initiating criminal proceedings* could mean different things in different cases, the court believed it occurred here when Hyche filed the arrest citation.  But the court acknowledged that Molett disagreed.

Molett objected, asserting that the trial court should only inform the jury that Hyche initiated criminal proceedings and that the jury would have to determine **when** this occurred based on the evidence.  The trial court noted Molett's objection and discussed how there really was not much precedent about malicious prosecution.  But it did not further discuss how it would respond nor read aloud a prepared response before directing a bailiff to take something back— possibly a written response to the jury's question.[3]

After further deliberations, the jury returned a verdict in favor of Hyche.

Molett contends that the judgment based on the jury's verdict must be reversed because the trial court erred in its response to the jury question about when criminal proceedings were initiated.  He also alleges error in the trial court's allowing witnesses to testify about others' statements to them and about their own observations which were not directly conveyed to police prior to his being arrested

---

[3] From our review of the video recording of the discussion about responding to the jury's question, the court appeared to have quickly written something on a piece of paper.  But we do not know if this was a response to the jury's question or something else entirely.

and charged. He contends this evidence should have been excluded on hearsay or relevancy grounds. Hyche disagrees with these assertions of error, but he contends the trial court erred in denying his motion for a directed verdict and that the judgment in his favor should be affirmed on this independent ground.

## ANALYSIS

I. *We Do Not Review Trial Court's Response to Jury Question for Error as Actual Response Was Not Cited in Brief nor Found in Record*

Molett first argues on appeal that reversal is mandated due to alleged error in the trial court's response to the jury's question.[4] He cites to the portion of the video record in which the court read the jury's question[5] and discussed its views on the question, and in which Molett lodged an objection. However, Molett fails to cite to any portion of the record containing the trial court's actual response—whether written or oral—provided to the jury. And we have not stumbled upon what the trial court actually told the jury in the voluminous record on appeal. Although we are not obligated to search the record, it does not appear to contain any written response to the jury's question. Nor have we located any video recording of the trial court orally addressing the jury to respond to its

---

[4] Molett now contends that if the trial court found it necessary to respond to the jury's question, it should have instructed the jury that Hyche initiated criminal proceedings when he decided to arrest Molett.

[5] From our review of the video record, the trial court appeared to be reading a written question submitted by the jury into the record. But the jury's written question was not included in the written record.

question or reading into the record a written response to the jury's question. Thus, we do not have the actual content of its response to review.

Without being able to review the actual response provided to the jury, we must assume it would support the trial court's judgment. As stated by the Kentucky Supreme Court:

> we have consistently and repeatedly held that it is an appellant's responsibility to ensure that the record contains all of the materials necessary for an appellate court to rule upon all the issues raised. And we are required to assume that any portion of the record not supplied to us supports the decision of the trial court.

*Clark v. Commonwealth*, 223 S.W.3d 90, 102 (Ky. 2007) (footnotes omitted). *See also Brannock v. Brannock*, 598 S.W.3d 91, 95 (Ky. App. 2019).

Best practice is for all communications between the jury and the trial court to be made part of the record. Obviously, the trial court saw fit to go on the record to read the jury's question, discuss how it might respond with counsel, and note Molett's objection. But we have not been directed to nor independently discovered a written or video record of what the trial court actually told the jury.

Molett's designation of record requested the entire record be transmitted, including all exhibits, attachments, and so forth. His counsel certified that he did not remove the record upon appeal to prepare the appellate brief. We do not know whether he inspected the record without removing it from the clerk's office. Regardless, counsel should have taken steps to make sure that the jury's

question and the response (if any) the trial court issued to the jury were provided as part of the record on appeal. As they were not, we are unable to review any additional jury instruction provided in response to the jury's question. Instead, we have before us only the trial court's written jury instructions which do not define the phrase *initiating criminal proceedings*. And as an appellate court, "we can rule solely upon the record presented to us." *Clark*, 223 S.W.3d at 102.

We decline Molett's invitation to opine on whether the trial court erred in its response to the jury's question when we could only speculate about the response's content. From our review of the portion of the record cited by Molett, we cannot even tell for sure whether the trial court issued its response in writing or orally. We do not know, for example, whether the trial court told the jury that the definition of *initiating criminal proceedings* could vary from case to case depending on the facts or simply told the jury that it occurred when the arrest citation was filed.

Taking steps to make sure all communications between the trial court and jury are on the record is especially important when a party wishes to challenge the content of the trial court's communications. If a written response to a jury question was lost or an oral response was deleted from the video record or never recorded, perhaps a narrative statement setting forth what the trial court actually told the jury could have been prepared. *See* Kentucky Rules of Civil Procedure

(CR) 75.13.  But we simply do not know how the trial court actually responded to the jury's question; we will not disturb its judgment based on speculation about the contents of any response.

## II.      Trial Court's Evidentiary Rulings Did Not Result in Reversible Error

We review the trial court's evidentiary rulings under an abuse of discretion standard.  *Lopez v. Commonwealth*, 459 S.W.3d 867, 873 (Ky. 2015).

Molett contends that the trial court erred in admitting testimony by witnesses Josh Keeling, Nedra Stikes Cheatham, and Christopher Brawner over his objections.  He claims this testimony should have been excluded as hearsay and/or as irrelevant to determining whether Hyche had probable cause to initiate criminal proceedings.  *See Martin v. O'Daniel*, 507 S.W.3d 1, 11-12 (Ky. 2016) (elements of a malicious prosecution claim include defendant's acting without probable cause in initiating, continuing, or procuring judicial proceeding against the plaintiff).

Except for Brawner "passing on" information (which Molett characterizes as hearsay on top of hearsay) to police, Molett contends that Brawner, Cheatham, and Keeling played no part in Hyche's probable cause determination.  Therefore, he argues, the testimony should have been excluded as irrelevant.  Molett has challenged much of the three witnesses' testimony on hearsay grounds at trial and on appeal.  However, from our review of the record

-10-

and applicable authority, no reversible error stemmed from the trial court's admission of testimony by Keeling, Brawner, and Cheatham.

*Keeling's Testimony*

Josh Keeling was the coordinator of the cheerleading competition. He did not work for the fairgrounds, but he communicated with fairgrounds officials at the event. He testified that his fairgrounds contact (Brawner) told him over the radio that a spectator told Brawner that an individual had exposed himself, so Keeling went over to investigate but did not see anyone "streaking" as he expected. He then testified to a woman (Shawna Ratliff)[6] approaching him, who directed his attention to Molett. Keeling testified that Molett appeared to be "sexually aroused" with a bulge in his pants (which Keeling believed to be an erection). He also testified to Ratliff's being in a group with several other upset parents and to there being requests to have Molett removed from the premises.

Keeling then testified to telling his contact at the fairgrounds that he saw a man "being inappropriate" who was not wearing the wristband required for entry and who needed to be removed. Keeling testified that his contact (Brawner)

---

[6] Keeling did not initially remember Ratliff's name when testifying and stated he had not gotten her name at the time. But he testified he later found out who she was and, when prompted, affirmed that the woman who approached him was Ratfliff. Keeling also did not initially remember Brawner's name when testifying, but Molett has seemingly accepted that Brawner was the fairgrounds official who communicated with Keeling.

-11-

moved away to make calls, so he could not hear what Brawner said. Shortly thereafter, Keeling observed security arrive.

*Brawner's Challenged Testimony*[7]

Brawner testified to an individual (whose name he could not remember, an event producer) calling him about hearing reports that a man was touching himself and that people wanted the man removed. He testified that for such removals, the police would need to come. He testified that police were called. When asked about his involvement in calling police, he testified that he spoke to the switchboard operator and said that people wanted this person removed.

On further questioning, Brawner testified he remembered hearing the man had been touching himself. He also testified to others telling him that the man did not belong there, as he was not there with a group, and this competition was not open to the general public. Also, he was told the man was not wearing the required wristband to show he had paid admission. He testified to talking to the person who told him of reports to get more information and to have people ready to talk to police, although he did not remember seeing a group together to speak to

---

[7] Brawner also testified to approaching Molett to investigate why he was there and taking steps to remove Molett. And he testified that Molett told him about trying to return sweatpants and trying to make a phone call and that Brawner suggested Molett try a different area code since Molett said the woman he tried to contact was from Indianapolis. Molett does not appear to challenge admission of Brawner's testimony about Brawner's interactions with Molett, however.

-12-

police. He testified to passing on the information he was given to police and to instructing the switchboard operator to call 911.

*Cheatham's Testimony*

Nedra Stikes Cheatham was working as a security guard at the fairgrounds. Her deposition testimony was read into the record at trial. She referred to an "incident report" which she had prepared on February 6, 2011, in her testimony. But this report was evidently not completed or provided to police prior to Molett being arrested and charged. We also note that the parties have not indicated in their briefs if or where a copy of her report is contained in the record.

Cheatham testified that she carried around a steno pad to take notes and prepared an incident report based on these notes, but the notes had been destroyed. When asked if she personally observed Molett engaged in indecent behavior around kids, she replied yes. She explained that she meant that she saw him with his phone directed toward the stage and with his hand in, around, or slightly under the waistband of his pants. She admitted that she did not know if he was taking photographs with his phone, or just texting. She also admitted that he may have just been putting his thumb in his belt loop or his hand in his pocket. She did not remember if it looked like Molett had an erection. She also testified that she "did not remember seeing him expose himself or rub himself or play with

-13-

himself" and later clarified that what she saw was "suspicious" rather than "indecent."

In addition to her personal observations of Molett, Cheatham testified to hearing a call from Brawner for another security unit and to writing that down. She explained that Brawner was a fairgrounds official working with the event coordinator to make sure everything needed for the event was provided. Cheatham testified that Brawner mentioned Keeling over the radio, although she did not recall speaking with Keeling herself. She further testified that according to her written report, there had been a complaint of a man "playing with himself." Cheatham acknowledged that different wording could have been used in the actual complaint such as referring to inappropriate behavior. Although she was not in the security unit Brawner called for, Cheatham stayed in the area to observe.

Cheatham testified to overhearing people talking about how they were glad someone was coming to remove the person they saw as suspicious. She also testified that Carper and Ratliff approached her to talk. She testified that she heard Brawner and guards asking Molett questions but did not hear Molett's responses and that she saw them escort him out. Cheatham also testified that Carper and Ratliff told her they had watched Molett "do this thing publicly and watched him for about 45 minutes." She soon thereafter turned the situation over to Brawner.

After receiving the information from Carper and Ratliff, Cheatham overheard Brawner calling the switchboard for police. She did not remember hearing Brawner call police, speaking with police herself, or providing police with charging information herself. Cheatham also remembered seeing Molett try to leave, but she testified that security would have to detain him until police arrived. She further testified that she began preparing her report after security asked Molett to go or escorted him out.

*A. Relevancy*

Molett points out that both Keeling and Cheatham testified to not speaking directly with police. But Keeling testified to communicating information to Brawner, who testified to passing on information (albeit secondhand and thirdhand) to police. Thus, some evidence indicates a possibility that some information was indirectly conveyed from Keeling to police via Brawner and may have played a part in Hyche's probable cause determination.

On the other hand, there is little or no indication that Cheatham even indirectly provided information to police prior to Molett's being arrested and charged. Still, her testimony may have helped the jury understand other testimony. (For example, Brawner and Keeling could not recall each other's names when testifying but Cheatham's report referred to communications between the two, identifying both by name).

-15-

Kentucky Rules of Evidence (KRE) 401 broadly defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Given this broad definition, the Kentucky Supreme Court has interpreted KRE 401 as establishing a "powerfully inclusionary" standard which is "met upon a showing of minimal probativeness." *Roe v. Commonwealth*, 493 S.W.3d 814, 820 (Ky. 2015). The trial court apparently applied such an inclusionary approach in determining the evidence to be relevant.

We conclude that the trial court did not abuse its discretion in determining that the evidence was relevant and thus admissible unless otherwise provided by law. KRE 402. Evidence indicates that both Brawner and Keeling directly or indirectly conveyed some information to police before Molett was arrested and charged. Despite no similar indication that Cheatham conveyed information to police in this time frame, Cheatham admitted that what she personally saw Molett doing might have been something innocuous and her testimony about others' statements was largely cumulative to other testimony. Thus, it is unlikely that her testimony had a significant effect on the ultimate outcome and any error in admitting her testimony was harmless. KRE 103; CR 61.01.

*B. Admissibility of Out-of-Court Statements*

In addition to challenging the relevancy of these witnesses' testimony (even of their own personal observations), Molett contends that these witnesses' testimony about out-of-court statements should have been excluded as hearsay. Hearsay is defined in KRE 801(c) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Generally, hearsay is not admissible except as specifically provided in other rules of evidence or Rules of the Kentucky Supreme Court. KRE 802. The parties have not cited any hearsay exception expressly recognized under our rules of evidence.

Molett contends that the trial court improperly admitted these witnesses' testimony about various statements as "investigative hearsay." Kentucky precedent makes clear that there is no "investigative hearsay" exception allowing for the admission of hearsay just because statements were made in a police investigation. *See, e.g.*, *Chestnut v. Commonwealth*, 250 S.W.3d 288, 294 (Ky. 2008). However, there are situations where out-of-court statements may be admitted into evidence because they are not offered for the truth of the matter asserted and thus are not hearsay as defined by KRE 801(c). For example, "a police officer may testify about information furnished to him only where it tends to explain the action that was taken by the police officer as a result of this information

*and* the taking of that action is an issue in the case." *Chestnut*, 250 S.W.3d at 294 (internal quotation marks and citations omitted). Such testimony about "investigative verbal acts" may be admitted only to explain the police officer's actions and not to prove the truth of the matter asserted in the statements. *Id.*

Hyche asserts that statements these witnesses testified to were not offered to prove the truth of the matter (such as what Molett did), but only to show their effects on those who heard or otherwise received such statements and how this caused them to act in investigating Molett. Molett points out, however, that these statements were not made directly **to police**. So, he argues that testimony about these statements should have been excluded despite holdings permitting (in certain circumstances) admission of statements made to police to explain police actions in precedent such as *Chestnut* and *Sanborn v. Commonwealth*, 754 S.W.2d 534, 541 (Ky. 1988), *overruled on other grounds by Hudson v. Commonwealth*, 202 S.W.3d 17, 22 (Ky. 2006).

Despite Molett's arguments to the contrary, however, the admissibility of the statements does not necessarily depend on the statements having been directly conveyed to police. Again, there is no special rule providing that hearsay rules do not apply to police officers or that hearsay rules do not govern the admissibility of statements made to police officers. Instead, the same rules apply to police and non-police. And under the verbal acts doctrine, statements to police

are just one example of out-of-court statements which might be admissible if not offered to prove the truth of the matter asserted:

> As stated in Lawson's *Kentucky Evidence Law Handbook,* § 8.00 (2d ed. 1984), in distinguishing the "verbal act" doctrine from hearsay, "*[a]n extrajudicial statement has a proper nonhearsay use when its utterance (not its substance) is a part of the issues of the case.*" Emphasis original. One example of this which Lawson provides in explaining "a wide variety of miscellaneous situations" where this rule applies is the extrajudicial statement to a police officer offered "not to prove the fact . . . but rather to explain the basis for" the action subsequently taken by the police officer. *Manz v. Commonwealth*, Ky., 257 S.W.2d 581 (1953). The fundamental premise underlying the use of such testimony is not the admissibility of "investigative hearsay" but the "verbal act" doctrine . . . .

*Sanborn*, 754 S.W.2d at 541. We see no reason why the verbal act doctrine would not apply to govern admissibility of statements made to non-police officers such as Keeling, Brawner, and Cheatham. So long as the statements were not offered to prove the truth of the matter asserted, such statements could be admitted if properly offered for other reasons and relevant to issues to be tried.

We conclude that the trial court did not abuse its discretion in admitting the witnesses' testimony about out-of-court statements. The testimony about the various statements provided potentially useful information to the jury about the communications made surrounding the incident—at least some of which may have been actually or potentially, directly or indirectly conveyed to police.

-19-

Hyche purportedly offered testimony about the statements only to show their effects on those who received them and how the investigation proceeded, and not for their truth. Molett apparently did not request a limiting admonition, but his counsel aptly pointed out the secondhand nature of such statements and how many such statements may not have been conveyed to police directly or at all upon cross-examination and in closing argument. The jury could decide for itself whether such communications were even conveyed to police and, if so, whether they could support a finding of probable cause given their secondhand nature.

In sum, we conclude that no reversible error arose from the trial court's evidentiary rulings.

III.    *We Need Not Reach Directed Verdict Argument*

As Molett's assertions of reversible error by the trial court fail, we need not reach Hyche's argument that the trial court erred in denying his motion for a directed verdict.

**<u>CONCLUSION</u>**

For the foregoing reasons, we affirm the judgment of the Jefferson Circuit Court.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Gregory A. Belzley
Prospect, Kentucky

Garry R. Adams, Jr.
Andrew "Pete" Lay
Louisville, Kentucky

BRIEF FOR APPELLEE:

David S. Kaplan
Cassie Chambers Armstrong
Louisville, Kentucky