# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: FEBRUARY 15, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0443-MR

CHRISTOPHER LAUPP                                    APPELLANT

V.
ON APPEAL FROM BOONE CIRCUIT COURT
HONORABLE JAMES R. SCHRAND, II, JUDGE
NO. 20-CR-00307

COMMONWEALTH OF KENTUCKY                             APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Christopher Laupp was convicted of one count of first-degree rape, two counts of first-degree sodomy, one count of incest, and one count of first-degree unlawful imprisonment. He was sentenced to forty years' imprisonment and appeals to this Court as a matter of right.[1] Having carefully reviewed the record and briefs, we affirm.

In 2020, Laupp and his wife, Kyra, had been married for ten years and resided in Boone County, Kentucky, with their two minor children, Charlotte and Mark.[2] At this time, Charlotte was ten years old. On April 24, 2020, Laupp and Kyra left the children at home and went to a party at a neighbor's

---

[1] KY. CONST. § 110(2)(b).

[2] The names Charlotte and Mark are pseudonyms used to protect the privacy of these minor individuals.

house.  Kyra returned home between 10:30 and 11 p.m.  Charlotte was still awake, playing video games.  Kyra told her it was bedtime and allowed her to "camp out" on the floor of the master bedroom that Kyra shared with Laupp.

Laupp became intoxicated at the party and returned home around 1 a.m. Kyra was asleep in bed while Charlotte was trying to sleep on the floor.  Laupp came to the doorway of the bedroom with a strange look on his face—a look similar to the one he used when Charlotte was in trouble.  He told Charlotte to get up and go to her room.

Charlotte was scared and attempted to get away from Laupp by climbing onto the top bunk in her room.  He told her to get down or he would hurt her "very badly."  After Charlotte got down, Laupp ordered her to remove her clothes and his pants.  He laid down on the bottom bunk and told Charlotte to sit on his stomach facing his feet.  Laupp then made Charlotte place her mouth on his penis while he placed his mouth on her vagina.  After the oral sex continued for some time, Laupp turned Charlotte around and placed his penis in Charlotte's vagina.  The penetration hurt and she tried to get away, but was unable.  Laupp refused her request to go use the bathroom.

When Laupp eventually fell asleep, Charlotte was able to go use the bathroom.  However, Laupp was standing in the bathroom doorway when she was leaving.  He told her to return to the bedroom where he raped her again. Laupp told Charlotte that he loved her, unlike the way he felt about her mother.  Around 4 a.m., Kyra woke up and noticed that Charlotte was not sleeping on the floor.  She went to check on Charlotte and could see a light

2

through the partially closed door of Charlotte's bedroom. When Kyra opened the door she saw Laupp and Charlotte on the bed, both naked from the waist down. Laupp appeared to be asleep. She saw Charlotte's vagina on Laupp's penis.

Kyra screamed and pulled Charlotte away. At this time, Kyra saw Laupp's penis flop onto his leg. Kyra took Charlotte into the master bedroom and locked the door. Laupp banged on the door claiming nothing had happened. Eventually, he broke through the door. The commotion awoke Mark who began crying. Kyra went and brought Mark back to the master bedroom.

Kyra called her father and asked him to come immediately. He was staying in Cincinnati on business and arrived approximately thirty minutes later. Before Kyra's father arrived, Laupp packed up his guns and left the residence. Kyra packed bags for herself and the children before leaving for her father's residence in Winchester, Kentucky. She called a child-abuse hotline. Around 9 a.m., Kyra took Charlotte to the hospital.

Charlotte underwent a sexual assault examination and sexual assault kit was collected. The examination revealed a fresh bruise and tenderness on the right side of her vulva. DNA was collected via several swabs. The vaginal swabs revealed the presence of male DNA, but the samples were unsuitable for comparison to a specific individual. Swabs taken from the crotch of Charlotte's

3

underwear also revealed the presence of saliva. The underwear was also subjected to Y-STR DNA[3] testing, which matched Laupp and his paternal line.

Following the examination, police and social services were contacted. Charlotte was interviewed at the Child Advocacy Center (CAC) a few days later. On April 29, 2020, detectives executed a search warrant for the Laupp residence in hopes of collecting the bedding from the bottom-bunk bed. However, the sheets had been stripped from that bed, while sheets remained on the other beds in the house, including the top bunk of Charlotte's bed. Kyra did not remove the sheets from the bottom bunk.

Laupp was indicted on charges of first-degree rape, first-degree sodomy, incest, and unlawful imprisonment. A jury trial commenced on June 20, 2022. Charlotte, who was twelve years old at the time of trial, testified, as did Kyra, the investigating detective, the two examining nurses, and two Kentucky State Police (KSP) lab analysts. Laupp testified in his own defense claiming that the allegations were concocted by Kyra to facilitate a divorce, gain the equity in the house, and secure custody of the children. He also called two neighbors as witnesses and presented expert testimony that the DNA found on the vaginal swab (which the KSP analysts found too limited to do a comparison on) was not a match. The jury found Laupp guilty on all charges and recommended a total sentence of forty years' imprisonment. The trial court

---

[3] Y-STR (short tandem repeat) testing focuses solely on the presence of the Y (male) chromosome, ignoring female genetic material.

accepted the jury's recommendation and entered sentence accordingly. This appeal followed.

## 1. Trial court properly denied motion for directed verdict

Laupp first argues he was entitled to a directed verdict on all charges.[4] Specifically, he contends the evidence, taken as a whole, was insufficient to support the convictions because it was so inherently improbable as to be unbelievable. We disagree.

At the outset, we note the issue of whether the evidence was inherently improbable differs from that presented to the trial court. At the close of the Commonwealth's case-in-chief, Laupp moved for a directed verdict on all charges. He specifically argued the Commonwealth failed to prove the element of unlawful restraint pertaining to the unlawful imprisonment charge and generally argued the evidence was insufficient to support the other charges. He renewed the motion on the same grounds at the close of all evidence.

To properly preserve a sufficiency-of-the-evidence claim in a criminal case, the defendant is required to:

> (1) move for a directed verdict at the close of the Commonwealth's evidence; (2) renew the same directed verdict motion at the close of all the evidence, unless the defendant does not present any evidence; and identify the particular charge the Commonwealth failed to prove, and *must identify the particular elements of that charge* the Commonwealth failed to prove.

---

[4] Because entitlement to a directed verdict would moot the remaining issues, we elect to address this issue first.

5

*Ray v. Commonwealth*, 611 S.W.3d 250, 266 (Ky. 2020) (emphasis added).

Under this standard, Laupp properly preserved the sufficiency issue pertaining

to the unlawful imprisonment charge while the sufficiency issue relating to the

other charges is unpreserved.  However, by failing to argue in his brief that the

Commonwealth did not prove the element of unlawful restraint pertaining to

the unlawful imprisonment charge, we conclude this issue has been

abandoned.  *See Middleton v. Commonwealth*, 198 Ky. 625, 249 S.W. 777

(1923).  Therefore, we will confine our review to the unpreserved issue of

whether the evidence was inherently improbable.

Because this issue is unpreserved, we review for palpable error under

RCr[5] 10.26 which provides

> A palpable error which affects the substantial rights of a party may
> be considered by the court on motion for a new trial or by an
> appellate court on appeal, even though insufficiently raised or
> preserved for review, and appropriate relief may be granted upon a
> determination that manifest injustice has resulted from the error.

A palpable error is "easily perceptible, plain, obvious and readily noticeable."

*Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). To demonstrate

manifest injustice, a party must show the "probability of a different result or

error so fundamental as to threaten a defendant's entitlement to due process of

law." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006) (quoting *Burns v.

Level*, 957 S.W.2d 218, 222 (Ky. 1997)).  In other words, a palpable error

occurs where "the defect in the proceeding was shocking or jurisprudentially

---

[5] Kentucky Rules of Criminal Procedure.

6

intolerable." *Id.* at 4. The failure to grant a directed verdict based on the insufficiency of evidence amounts to palpable error because "it is clear that a different result would occur, since a defendant convicted on insufficient proof should be acquitted." *Commonwealth v. Goss*, 428 S.W.3d 619, 627 (Ky. 2014). A conviction based on insufficient evidence necessarily results in manifest injustice. *Id.*

The denial of a motion for directed verdict will not be reversed unless the appellate court determines "it would be clearly unreasonable for a jury to find guilt." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). When confronted with a motion for directed verdict, the trial court must assume the truth of the Commonwealth's evidence and "draw all fair and reasonable inferences from the evidence in favor of the Commonwealth." *Id.* Questions regarding the weight of the evidence and the credibility of witnesses are reserved for the jury. *Id.* A conviction must be based on "evidence of substance, and the trial court is expressly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence." *Id.* at 187-88. Ultimately, the directed-verdict standard depends on "the statutes creating the offense[,]" and "is not controlled by the law as described in the jury instructions[.]" *Acosta v. Commonwealth*, 391 S.W.3d 809, 816 (Ky. 2013), *overruled on other grounds by Ray*, 611 S.W.3d at 250.

The general rule in Kentucky is that "[i]t is only where the testimony is so incredible *on its face* as to require its rejection as a matter of law that the jury will not be permitted to consider it." *Ross v. Commonwealth*, 531 S.W.3d 471,

7

475 (Ky. 2017) (quoting *Daulton v. Commonwealth*, 310 Ky. 141, 220 S.W.2d 109, 110 (1949)). This unusual circumstance arises "when the substance of the testimony, *detached from the personal credibility of the witness* . . . is so laden with doubt and implausibility that it cannot rationally be regarded as a fact capable of supporting a verdict." *Id.* (emphasis added). In other words, "the jury may not . . . base its verdict upon a statement as to what occurred or how something happened when it is opposed to the laws of nature or is clearly in conflict with the scientific principles, or base its verdict upon testimony that is so incredible and improbable and contrary to common observation and experience as to be manifestly without probative value." *Id.* at 476 (quoting *Coney Island Co. v. Brown*, 290 Ky. 750, 162 S.W.2d 785, 787-88 (1942)). Furthermore, we note the testimony of a child victim does not require additional corroboration to support a conviction unless "the unsupported testimony of the victim is '. . . contradictory, or incredible, or inherently improbable.'" *Garrett v. Commonwealth*, 48 S.W.3d 6, 10 (Ky. 2001) (quoting *Robinson v. Commonwealth*, 459 S.W.2d 147, 150 (Ky. 1970)).

We reject Laupp's argument that the Commonwealth's evidence was so inherently improbable that it could not be believed by a rational trier of fact. Under the reasonable doubt standard, "that which a jury may reasonably believe to have been probable is enough to support a finding of guilt." *Timmons v. Commonwealth*, 555 S.W.2d 234, 237-38 (Ky. 1977). Kentucky law simply does not require the degree of scientific certainty urged by Laupp. His complaints about the scientific evidence pertain solely to the weight as opposed

to the sufficiency of the evidence. Moreover, Laupp's contention that the absence of semen negates the validity of his convictions borders on the frivolous. Proof of ejaculation is not now, and has never been, required to sustain a conviction for rape or other sexual offenses. *See* KRS 510.010(8) ("Sexual intercourse occurs upon any penetration, however slight; emission is not required."); *see also White v. Commonwealth*, 96 Ky. 180, 28 S.W. 340, 342 (1894) ("[I]n this country the proof of emission seems never to have been required. . . . [T]he essence of the crime is the violence done to the person . . . which is completed by penetration without emission[.]").

Similarly, Laupp's argument that he had no fathomable motive to commit these acts of sexual violence "directly prior to filing for divorce" is merely a question of credibility which is properly reserved for the jury. Moreover, proof of a criminal defendant's motive is not required to support convictions of rape, sodomy, and incest. *See Isaacs v. Commonwealth*, 553 S.W.2d 843, 845 (Ky. 1977). Importantly, Laupp overlooks the countervailing evidence of his prior sexual misconduct and intoxication.[6] Further, we emphatically reject the notion that Kyra's actions or omissions following her discovery of Laupp's actions undercuts the sufficiency of the evidence. Laupp is merely asking this Court to usurp the jury's role in assessing the weight of the evidence and the credibility of the witnesses. A cursory review of the evidence at trial in light of

---

[6] *See* Issue 2, *infra,* regarding this Kentucky Rules of Evidence (KRE) 404(b) evidence.

the applicable statutes clearly demonstrates the sufficiency of the evidence to support the convictions on all charges.

Under Count 1 of the indictment, Laupp was charged with incest. The elements of incest are set forth in KRS 530.020:

(1) A person is guilty of incest when he or she has sexual intercourse or deviate sexual intercourse, as defined in KRS 510.010, with a person whom he or she knows to be his or her parent, child, grandparent, grandchild, great-grandparent, great-grandchild, uncle, aunt, nephew, niece, brother, sister, first cousin, ancestor, or descendant. The relationships referred to herein include blood relationships of either the whole or half blood without regard to legitimacy, relationship of parent and child by adoption, relationship of stepparent and stepchild, and relationship of stepgrandparent and stepgrandchild.

For the purpose of sexual offenses and incest, KRS 510.010(8) defines "sexual intercourse" as:

[S]exual intercourse in its ordinary sense and includes penetration of the sex organs of one person by any body part or a foreign object manipulated by another person. Sexual intercourse occurs upon any penetration, however slight; emission is not required. "Sexual intercourse" does not include penetration of the sex organ by any body part or a foreign object in the course of the performance of generally recognized health-care practices[.]"

Additionally, "deviate sexual intercourse" is defined as "any act of sexual gratification involving the sex organs of one person and the mouth or anus of another." KRS 510.010(1).

We conclude the evidence was sufficient to support the incest conviction. It is undisputed that Laupp is Charlotte's biological father. Charlotte directly testified Laupp subjected her to sexual intercourse by penetrating her vagina with his penis and deviate sexual intercourse by placing his mouth on her vagina and her mouth on his penis.

10

Under Count 2 of the indictment, Laupp was charged with first-degree rape, victim less than twelve years old. The elements of first-degree rape are set forth in KRS 510.040:

(1) A person is guilty of rape in the first degree when:

(a) He engages in sexual intercourse with another person by forcible compulsion; or

(b) He engages in sexual intercourse with another person who is incapable of consent because he:

1. Is physically helpless; or

2. Is less than twelve (12) years old.

We are convinced the evidence was sufficient to support the conviction for first-degree rape. Charlotte testified Laupp forced her to take off her shorts and underwear and made his "lower part" and her "lower part" combine. She testified that the sexual intercourse hurt. Kyra testified she saw Charlotte on top of Laupp, both of them naked from the waist down, with Charlotte's vagina on Laupp's penis. The examining nurses observed a bruise on Charlotte's vulva the day after the assault. It is undisputed that Charlotte was less than twelve years of age at the time of the rape.

Under Counts 3 and 4 of the indictment, Laupp was charged with first-degree sodomy. KRS 510.070 sets forth the elements of first-degree sodomy as follows:

(1) A person is guilty of sodomy in the first degree when:

(a) He engages in deviate sexual intercourse with another person by forcible compulsion; or

11

(b) He engages in deviate sexual intercourse with another person who is incapable of consent because he:

   1. Is physically helpless; or

   2. Is less than twelve (12) years old.

Again, it is undisputed that Charlotte was less than twelve years old at the time of the offense. She testified that Laupp placed his mouth on her vagina and placed his penis in her mouth. This evidence was sufficient to support the two convictions of first-degree sodomy.[7]

Under Count 5 of the indictment, Laupp was charged with first-degree unlawful imprisonment. KRS 509.020 sets forth the elements of first-degree unlawful imprisonment:

> (1) A person is guilty of unlawful imprisonment in the first degree when he knowingly and unlawfully restrains another person under circumstances which expose that person to a risk of serious physical injury.

KRS 509.010(2) defines "restrain" as

> means to restrict another person's movements in such a manner as to cause a substantial interference with his liberty by moving him from one place to another or by confining him either in the place where the restriction commences or in a place to which he has been moved without consent. A person is moved or confined "without consent" when the movement or confinement is accomplished by physical force, intimidation, or deception, or by any means, including acquiescence of a victim, if he is under the age of sixteen (16) years, or is substantially incapable of appraising or controlling his own behavior.

Additionally, we note

---

[7] Although Laupp has not raised any issues regarding the jury instructions, we note that instructions 6 and 7 properly differentiated between the two counts of sodomy by specifying the particular body parts used.

a parent is subject to criminal prosecution for false imprisonment of his or her child, where the act of confinement is done with the intent of endangering the child's health and safety, or to achieve an unlawful purpose, because such an act exceeds the scope of parental authority.

32 Am. Jur. 2d *False Imprisonment* § 161 (2023).

In the present appeal, Laupp used intimidation to force Charlotte from her mother's bedside to her own room before the sexual assault occurred. Charlotte tried to escape from Laupp by going onto the top bunk in her room, but Laupp told her to get down or he would hurt her "really badly." After Laupp raped and sodomized Charlotte, he refused her request to go to the bathroom. When Charlotte did manage to go use the bathroom after Laupp fell asleep, he awoke and forced her to return to her bedroom where he raped her again. Charlotte testified she did not cry for help because she was scared Laupp would hurt her or her mother. We are convinced this evidence was sufficient to support the conviction for first-degree unlawful imprisonment because the jury could reasonably believe Laupp's unlawful restraint of Charlotte's liberty went beyond that necessary to carry out the acts of rape, sodomy, and incest. *See* KRS 509.050 (kidnapping exemption statute).

## 2. Evidence of prior sexual misconduct was properly admitted

Laupp next argues the trial court erred by allowing improper evidence of prior sexual misconduct committed against the victim. Specifically, he contends the evidence of his prior misconduct was insufficiently probative to be admissible. We disagree.

13

The Commonwealth argues this argument is not properly preserved for review because Laupp failed to object to the introduction of the prior misconduct evidence at trial. Prior to trial, the Commonwealth filed notice under KRE 404(c) of its intent to introduce evidence of two prior incidents of sexual misconduct involving Charlotte. Both instances occurred at the Laupp residence in Kenton County, Kentucky, when Charlotte was approximately seven years of age.[8] On the first occasion, Laupp called Charlotte to her bedroom where he masturbated to ejaculation in her presence. On the second occasion, Laupp and Charlotte were play wrestling when he placed her on his lap directly over his clothed penis and asked her if it felt good.

Laupp filed a motion in limine to exclude this evidence as unreliable because "these new allegations [were] not the product of a scientific forensic interviewing process[]" and "were brought about by subtle suggestions, leading questions, or other techniques that would render this testimony inadmissible on [its] face." At the hearing on the motion, Laupp submitted for a ruling upon the parties' written arguments. The trial court denied Laupp's motion by written order entered prior to trial.

Because Laupp's motion identified the two prior instances of sexual misconduct as the matter objected to, and further identified probativeness as the grounds for objection, we conclude this issue was properly preserved despite the lack of contemporaneous objection. *See Jenkins v. Commonwealth,*

---

[8] At trial, Charlotte testified she was at least six years of age when the prior abuse occurred, but did not recall her precise age.

14

607 S.W.3d 601, 612 (Ky. 2020). Further, review on the merits is appropriate because Laupp is now advancing essentially the same probativeness issue on appeal as he did before the trial court. *See Gasaway v. Commonwealth*, 671 S.W.3d 298, 313-14 (Ky. 2023) (noting appellate courts review issues as opposed to arguments).

Under KRE 404(b), evidence of other crimes, wrongs or acts is generally inadmissible to prove a defendant's character or propensity to act in conformity therewith, but may be admissible "[i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" KRE 404(b)(1). To determine the admissibility of prior bad acts evidence, courts must ascertain whether the evidence is relevant for a permitted purpose, probative of the prior bad act, and not unduly prejudicial under KRE 403. *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994). We review a trial court's decision on the admissibility of evidence under KRE 404(b) for abuse of discretion. *Gasaway*, 671 S.W.3d at 334.

Probativeness under the *Bell* test "relates to whether there is sufficient evidence that the 'other crime, wrong, or act' actually occurred." *Davis v. Commonwealth*, 147 S.W.3d 709, 724 (Ky. 2004) (quoting *Bell*, 875 S.W.2d at 890). This is a question of conditional relevance under KRE 104(b) which provides:

> Relevancy conditioned on fact. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall

15

> admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

*Id.* In this context, evidence of the prior bad act should be admitted "if the jury could reasonably conclude that the act occurred and that the defendant was the actor." *Davis*, 147 S.W.3d at 724-25 (citing Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.25[3][c], at 131 (4th ed. LexisNexis 2003); and *Huddleston v. United States*, 485 U.S. 681, 689 (1988)). When undertaking a conditional relevance analysis, "the trial court neither weighs credibility nor makes a finding that the Government has proved the conditional fact by a preponderance of the evidence." *See Huddleson*, 485 U.S. at 690. Instead, "[t]he court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence." *Id.* (citing 21 C. Wright & K. Graham, *Federal Practice and Procedure* § 5054, p. 269 (1977)).

In the present appeal, Charlotte identified Laupp as the perpetrator of two specific instances of prior sexual misconduct. This evidence was sufficiently probative to warrant admission because the jury could reasonably conclude the acts occurred and that Laupp was the perpetrator. Laupp's complaints regarding the reliability of this evidence in light of Charlotte's inconsistent statements pertain to the weight and credibility of the evidence, rather than its admissibility. The trial court did not abuse its discretion.

### 3. Request for victim's psychological counseling records was waived

Laupp argues the trial court erred by failing to require the production of Charlotte's psychological counseling records for *in camera* review. Upon review of the record, we conclude this issue was waived.

Charlotte had received medical treatment for attention deficit hyperactivity disorder (ADHD) and oppositional defiant disorder (ODD) prior to the charged offenses. After the charged offenses, she underwent psychological counseling. Prior to trial, Laupp moved the court to produce Charlotte's counseling records for *in camera* review. He argued the records contained potentially exculpatory evidence relating to Charlotte's credibility because her recollection of his prior sexual misconduct occurred after she underwent counseling. Laupp further argued Charlotte's recollection of the uncharged misconduct occurred as a result of therapy and contradicted her prior statement that he had never previously abused her. In support of his motion, Laupp tendered, under seal, Charlotte's medical records that were already in his possession. On April 7, 2022, the trial court addressed the motion at a hearing along with several other matters including Laupp's motion to continue the trial which, at that time, was scheduled for April 18, 2022. The trial court expressed its concern regarding the timing of the motion and stated from the bench, "I will look at what you have provided, but at this point I am not going to continue the trial."[9] The trial court did not make an explicit ruling on

[9] The trial court's concerns stemmed from the fact that Laupp had notice of the Commonwealth's intention to introduce evidence of the prior misconduct since March 10, 2021; had access to a recording of the CAC interview where Charlotte purportedly

17

Laupp's motion regarding the counseling records. However, the trial was later continued until June 20, 2022, on different grounds, and the trial court held two additional pretrial conferences to address outstanding motions in the interim. Yet, Laupp neither insisted upon nor obtained a definitive ruling on his motion to produce Charlotte's counseling records.

An "appellate court reviews for errors, and a nonruling cannot be erroneous when the issue has not been presented to the trial court for decision." *Commonwealth v. Smith*, 542 S.W.3d 276, 285 (Ky. 2018) (quoting *Hatton v. Commonwealth*, 409 S.W.2d 818, 819-20 (Ky. 1966)). Thus, "[i]t is the duty of one who moves the trial court for relief to insist upon a ruling, and a failure to do so is regarded as a waiver." *Dillard v. Commonwealth*, 995 S.W.2d 366, 371 (Ky. 1999) (citing *Brown v. Commonwealth*, 890 S.W.2d 286, 290 (Ky. 1994); and *Wilkey v. Commonwealth*, 452 S.W.2d 420, 422 (Ky. 1970)). "The valid waiver of a known right precludes appellate review while a forfeited claim of error may be reviewed for palpable error." *Gasaway*, 671 S.W.3d at 314. Indeed, "nothing contained in RCr 10.26 precludes the waiver of palpable error or even waiver of a constitutional right." *West v. Commonwealth*, 780 S.W.2d 600, 602 (Ky. 1989). This Court has steadfastly maintained that

> [t]he trial court must ensure a fair trial; the trial court is not burdened by the duty to try the case on behalf of defense counsel. Even when an objection or motion has been made, the burden

---

denied the prior abuse since June 26, 2020; and had possession of medical records indicating that Charlotte was undergoing therapy for an indeterminate amount of time.

> continues to rest with the movant to insist that the trial court render a ruling; otherwise, the objection is waived.

*Thompson v. Commonwealth*, 147 S.W.3d 22, 40 (Ky. 2004) (citing *Bell v. Commonwealth*, 473 S.W.2d 820, 821 (Ky. 1971), *superseded by statute on other grounds as stated in Jackson v. Commonwealth*, 363 S.W.3d 11 (Ky. 2012).  Simply put, an appellate court is unable to review an alleged error in the absence of a ruling by the trial court.  *Todd v. Commonwealth*, 716 S.W.2d 242, 248 (Ky. 1986).

We are convinced that Laupp's failure to obtain a ruling on his motion constitutes a waiver as opposed to a forfeiture.  After the trial court initially reserved ruling on April 7, 2022, it held additional pre-hearing conferences on May 11, 2022, and June 15, 2022, to address various other outstanding motions.  Laupp neither mentioned nor requested a ruling on his request for the counseling records.  Additionally, on the morning of trial, the trial court addressed certain other preliminary matters and asked the parties if there were any other issues that needed to be resolved before the jury was empaneled.  Again, Laupp did not request a ruling on his request for records.  Without a concrete ruling to review, this Court can only speculate as to the decision the trial court would have made and what course of action the parties may have taken thereafter.

Nevertheless, we have reviewed the medical records Laupp submitted under seal in support of his motion.  We agree with the Commonwealth that Laupp's failure to utilize these records, which were in his possession, for impeachment purposes at trial belies his claim that they were demonstrably

19

exculpatory. Moreover, contrary to Laupp's assertions, there is nothing in the present record connecting Charlotte's allegations of his prior misconduct to her therapy. In its order denying Laupp's motion to exclude the evidence of his prior misconduct, the trial court specifically found that Charlotte disclosed the prior abuse on handwritten notes which she produced in a meeting with the Commonwealth's attorney, her GAL, and her mother. At trial, Charlotte testified that she did not remember the circumstances surrounding her realization regarding the prior abuse and noted that she did not understand what these behaviors meant at the time. We further observe that Laupp cross-examined Charlotte and other witnesses concerning her prior inconsistent statement regarding the absence of prior abuse. Under these circumstances, we do not perceive any manifest injustice.

### 4. Trial court did not improperly admit evidence of child sexual abuse accommodation syndrome and victim impact evidence

Laupp argues the trial court improperly allowed evidence of child sexual abuse accommodation syndrome (CSAAS) and victim-impact evidence during the guilt phase. He concedes this error was unpreserved and requests palpable error review.

On the first day of trial during its case-in-chief, the Commonwealth asked Kyra on direct examination about the circumstances immediately following the assault. Kyra testified that Laupp texted her to ask if they could have Charlotte medically examined to prove the assault never happened. She further testified that she did take Charlotte to have a sexual assault examination and that it was a difficult experience. The Commonwealth asked

20

Kyra what Charlotte's demeanor was like "during this time." Kyra testified that Charlotte was quiet and withdrawn. She also testified that Charlotte remained quiet and withdrawn after the examination when they went to stay at the residence of Kyra's father. Kyra also described Charlotte's demeanor at the interview with CAC personnel as basically "done at that point, she was kind of quiet and just didn't want to do it anymore." The Commonwealth then asked Kyra to describe Charlotte before and after the assault. Prior to the assault, Kyra described her as a happy, beautiful little girl. After the assault, Kyra described Charlotte as having a really hard time and being very depressed.

The Commonwealth elicited similar testimony from Charlotte on direct examination. Charlotte testified that she experienced anger, depression, anxiety, and difficulty sleeping after the abuse she endured. She also stated that she had thoughts of not existing and had issues with self-harm. The Commonwealth followed up on Charlotte's testimony in its closing argument:

> Most telling about [Charlotte's] testimony. How this impacted her. What did she tell you? I have thoughts about not existing. A twelve-year-old girl had thoughts about leaving the world, not because her parents are separated, not because Defense's preposterous theory that she was coached. No, because every day of her life, she will never forget what this man did to her. So much that she was willing to remove herself from this world. Her testimony alone you can believe beyond a reasonable doubt.

Evidence of a victim's emotional injury is relevant and admissible to prove the fact of a sexual assault so long as the evidence pertains to "behavior or conduct that is within the understanding of ordinary personal experience[.]" *Blount v. Commonwealth,* 392 S.W.3d 393, 397 n.3 (Ky. 2013) (citing *Dickerson v. Commonwealth,* 174 S.W.3d 451, 471–72 (Ky. 2005)). In other words, our

21

decision in *Dickerson* permits the victim or a person familiar with the victim to describe observed changes in the victim's behavior following the alleged assault. 174 S.W.3d at 471–72. This type of evidence is especially probative to contradict a denial that the assault occurred. *Id.*

However, when the significance of behavioral changes or other post-assault conduct "as an indicator of sexual abuse is far from the realm of ordinary personal experience[,]" then such evidence runs afoul of Kentucky's longstanding prohibition on CSAAS evidence. *Blount*, 392 S.W.3d at 397 n.3. CSAAS is a term "used to describe a number of symptoms which can be recognized in children who have been sexually abused by someone to whom they are closely related, and includes, among other things, a tendency to be secretive, frightened, and to experience a great deal of guilt." *Bussey v. Commonwealth*, 697 S.W.2d 139, 140-41 (Ky. 1985). "[T]his Court has consistently held that the symptoms, or signs, of the 'so-called' child sexual abuse accommodation syndrome are not admissible" because they lack general scientific acceptance.[10] *Blount*, 392 S.W.3d at 395. The prohibition against CSAAS evidence is not limited to expert testimony. *Id.*

We cannot conclude the testimony regarding Charlotte's emotional distress following the sexual assault constituted indirect evidence of CSAAS. While Charlotte testified that she went to therapy after the assault, there was

---

[10] Admittedly, Kentucky jurisprudence on the admissibility of CSAAS is an outlier among our sister jurisdictions. *See King v. Commonwealth*, 472 S.W.3d 523, 533 (Ky. 2015) (Abramson, J., dissenting). However, we need not revisit the continuing viability of our precedents on this subject today.

nothing in this evidence depicting her emotional distress as a "symptom or sign" of sexual abuse. *See Tackett v. Commonwealth*, 445 S.W.3d 20, 35 (Ky. 2014). Further, neither Kyra's nor Charlotte's testimony linked Charlotte's behavior to knowledge derived from a therapeutic setting or otherwise tended to imbue their observations with scientific validity. *Id.* Instead, their testimony simply recounted observations of commonly understood changes in the victim's behavior and demeanor following the sexual assault.

Laupp further argues that the same testimony regarding Charlotte's emotional distress constituted impermissible victim impact evidence. In *Alderson v. Commonwealth*, 670 S.W.3d 884, 893 (Ky. 2023), we held that "victim impact evidence masquerading as victim background evidence is not permissible as the 'introduction of victim impact evidence during the guilt phase is reversible error.'" (Quoting *Tackett*, 445 S.W.3d at 33). While the Commonwealth is certainly permitted to "introduce evidence, after a determination of guilt, relevant to the impact of the crime upon the victim, including any physical, psychological, or financial harm" pursuant to KRS 532.055(2)(a)(7), we have consistently disapproved of the use of this type of evidence when determining guilt. *Roe v. Commonwealth*, 493 S.W.3d 814, 823 (Ky. 2015). However, the Commonwealth is "entitled to show the jury that the victim was not a mere statistic, but a living person[.]" *Id.* (quoting *Bennett v. Commonwealth*, 978 S.W.2d 322, 324–26 (Ky. 1998)). "The line between relevant-background information and prejudicial-impact testimony is a narrow one; but we essentially distinguish the two forms of testimony by inquiring

23

whether the witness was overly emotional, condemnatory, or accusatory in nature." *Id.* at 824 (citing *Foley v. Commonwealth*, 953 S.W.2d 924, 937 (Ky. 1997)). Another "way to determine the difference between victim impact evidence and victim background evidence is whether the evidence is 'aimed primarily at appealing to the jurors' sympathies' or 'providing an understanding of the nature of the crime[.]'" *Alderson*, 670 S.W.3d at 893 (quoting *Tackett*, 445 S.W.3d at 33). The issue of whether such evidence is truly relevant in a particular case is committed to the sound discretion of the trial court. *Davis v. Commonwealth*, 620 S.W.3d 16, 29 (Ky. 2021).

In the present appeal, we need not draw the line between proper emotional distress evidence and improper victim impact evidence by determining this disputed issue of admissibility in the first instance. While certain portions of the evidence relating to Charlotte's emotional distress may have approached the line as described in *Alderson*, we do not discern any palpable error amounting to manifest injustice. Contrary to the situation in *Alderson*, the present appeal did not involve the typical "he said, she said" situation. Kyra witnessed Laupp in bed with Charlotte, both naked from the waist down with their private parts touching. The physical evidence also distinguishes the present appeal from *Alderson*. Medical personnel observed a fresh bruise on Charlotte's vulva the day after the assault. Additionally, forensic testing of a vaginal swab taken from Charlotte revealed male DNA, and Y-STR DNA testing of Charlotte's underwear (worn immediately after the rape) revealed male DNA matching Laupp and his paternal line of relatives.

24

Moreover, the testimony here was brief and straightforward. Admittedly Kyra displayed emotion during her testimony. However, we cannot say her testimony was overly emotional, inflammatory, or calculated to garner the jury's sympathy. Both Kyra and Charlotte properly testified to behavioral and emotional changes in the aftermath of the assault. *See Dickerson*, 174 S.W.3d at 471–72. Perhaps an objection to the scope of the testimony may have been sustained. However, in context, the evidence was offered as legitimate factual evidence to counter Laupp's denial that the assault occurred.

**5. Commonwealth did not mischaracterize evidence in closing argument**

Laupp next argues the Commonwealth committed prosecutorial misconduct by mischaracterizing DNA and other evidence. This issue was not preserved by a contemporaneous objection. However, Laupp has requested palpable error review.

When a defendant fails to make a contemporaneous objection to alleged prosecutorial misconduct, we will only reverse if flagrant misconduct rendered the entire trial fundamentally unfair. *Dickerson v. Commonwealth*, 485 S.W.3d 310, 329 (Ky. 2016). To determine whether improper comments amount to flagrant prosecutorial misconduct, we must examine: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Id.* (quoting *Mayo v. Commonwealth*, 322 S.W.3d 41, 56 (Ky. 2010)). We generally give both the prosecutor and defense counsel wide latitude during closing

25

arguments because argument is not evidence. *Slaughter v. Commonwealth*, 744 S.W.2d 407, 412 (Ky. 1987).

During its closing the argument, the Commonwealth made several references to the DNA evidence:

> I want to get into the physical evidence. First off, use common sense and reality. The whole smoke and mirrors show, this whole trial, the Defense has put on with twisting words and coming up with preposterous explanations for the most basic of evidence. Use your common sense.
>
> There is no legitimate reason in this world why a male's DNA is inside a ten-year-old's vagina. There is no legitimate reason in this world why a biological father, Christopher Laupp's DNA, saliva, is in the crotch area of her underwear. The only reason those things are on [Charlotte's] body and into her underwear is because he committed rape and he sodomized her.

The Commonwealth later returned to the subject:

> Now ladies and gentlemen, where his [Laupp's] DNA is very important. You have a bag of her clothes. Her blue, I think it was a unicorn hoodie, her little black Justice shorts, her t-shirt, his DNA wasn't found on her clothes, her hoodie, it wasn't found on a blanket in her room, that would make sense, they all live in the same house together.
>
> No, where was his male DNA found? The most intimate part, the sexual assault kit. It was found in the inside crotch of her pink underwear, and it was found in a vaginal swab. Again, the physical evidence backs up and supports what [Charlotte] told you happened.

The Commonwealth further continued:

> The DNA vaginal swabs. I am going to be very clear. Alison Tunstill with the Kentucky State Police Crime Lab and Dr. Miller [the defense expert] both agree that there is male DNA inside of [Charlotte's] vagina. There is no contesting that. Whose male DNA is it? [Charlotte] told you. It's her Dad's. Alison explained, she found male DNA on the vaginal swab but because there are three alleles, she's not going to compare it to any other male. She also

26

explained with those three alleles the reasons why she is not going to compare it . . . . They both know it is male, but whose DNA is it?

. . .

Ladies and gentlemen, [Charlotte] told you where that male DNA came from. Her father. The DNA of her father right there. It is not a coincidence where it was located. After the sexual acts, when she puts her underwear up, it hits right in the spot of where everything happened. This Defendant isn't just an unlucky person having all of this against him. He's guilty.

We cannot conclude the Commonwealth's argument mischaracterized the evidence or otherwise misled the jury. Samantha Sexton, KSP forensic biologist, testified regarding the serological evidence. She tested items recovered from the sexual assault kit for semen and saliva. In Sexton's opinion, the vaginal swabs revealed the presence of saliva. Similarly, Sexton opined that a sample taken from the crotch of Charlotte's underwear revealed the presence of saliva. Sexton further testified that she sent the items which had tested positive for saliva for further DNA analysis, which was ultimately performed by Alison Tunstill, a KSP forensic specialist. Tunstill testified there was some quantity of male DNA found in Charlotte's vaginal swabs, but the sample was not suitable for comparison to any specific individual. She further testified regarding Y-STR DNA testing on Charlotte's underwear that matched Laupp and his paternal relatives.

The Commonwealth's argument tracked the evidence at trial and did not mischaracterize the vaginal swabs as a scientific match to Laupp. The Commonwealth argued that the jury could reasonably infer the male DNA from the vaginal swabs matched Laupp based on the totality of the evidence. *See*

27

*Newcomb v. Commonwealth*, 410 S.W.3d 63, 89 (Ky. 2013) (holding Commonwealth is "entitled to draw reasonable inferences from the evidence, as well as respond to matters raised by the defense"). Moreover, the Commonwealth was certainly not required to accept the opinion of Laupp's expert especially in light of the countervailing evidence of Laupp's guilt. The Commonwealth did not commit prosecutorial misconduct.

### 6. Trial court did not violate Laupp's right to open trial

Laupp next argues the trial court improperly excluded his family from the courtroom during the jury selection process. This argument was not properly preserved for appellate review as it was raised for the first time in a motion for a new trial. *Meece v. Commonwealth*, 348 S.W.3d 627, 684 n.33 (Ky. 2011); RCr 9.22. However, Laupp again requests palpable error review under RCr 10.26.

While resolving preliminary matters on the first day of trial, the trial court informed the parties:

> I was going to seat thirteen jurors, we will seat one alternate. So we will have 31 in the voir dire panel. That will be in that group of seats right there [pointing to courtroom gallery], so they may move around a little bit. . . . And I don't know how crowded the courtroom may be during voir dire, so we may have to have, if they can just make sure the potential jurors have seats first, that will be on both sides.

At the commencement of voir dire, the trial court stated, "I will let them start bringing in the jurors and just make sure they have plenty of room in the courtroom for that." The Commonwealth responded:

28

Your honor, just given space, we are going to have our people step out and I think it would be probably pertinent if everyone did until the jurors were called in.

The trial court agreed and cleared the audience of the courtroom until all the prospective jurors were seated. Laupp did not object.

The trial court did not completely bar the public from the courtroom during voir dire. On the contrary, the trial court acted efficiently to accommodate the prospective jurors within the limited space available. While Laupp claims his family was improperly excluded from the courtroom, there is no evidence of record that they were denied entry. Apparently, the Commonwealth's support staff and Laupp's private investigator returned to the courtroom after the venire was seated. Further, even if the trial court's actions amounted to a closure of the courtroom, Laupp waived any error by failing to object. *See Crutcher v. Commonwealth*, 500 S.W.3d 811, 815-16 (Ky. 2016). In *Crutcher*, we declined to a review a claim that the closure of the courtroom amounted to palpable error because

> [a]s the matter stands today, we see no reason for this issue to depart from our time-honored paradigm requiring parties who feel aggrieved by some action taken at the trial court to expend the minimal energy required to preserve that issue in the record. Excluding spectators from the courtroom is not an action of judicial legerdemain that can catch even an attentive attorney off balance. Rather, it is unmistakable; any attorney not asleep in his chair would understand the change in scenery and face the conscious decision of whether to state an objection to the trial court's decision. Defense counsel obviously chose not to object here, and we see no reason why it is our duty to do his job for him.

*Id.* at 816. By failing to object to the trial court's actions, we conclude Laupp waived any claim of error.

### 7. There was no cumulative error to warrant reversal

Finally, Laupp argues his convictions should be reversed under the cumulative error doctrine. We disagree.

The cumulative error doctrine provides that "multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). "We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Id.* (citing *Funk v. Commonwealth*, 842 S.W.2d 476 (Ky. 1992)). Further, "[w]here . . . none of the errors individually raised any real question of prejudice, we have declined to hold that the absence of prejudice plus the absence of prejudice somehow adds up to prejudice." *Id.* (citing *Furnish v. Commonwealth*, 95 S.W.3d 34 (Ky. 2002)). A criminal defendant "is guaranteed a fair trial[,]" but "[t]his does not mean, however, a perfect trial, free of any and all errors." *McDonald v. Commonwealth*, 554 S.W.2d 84, 86 (Ky. 1977). In the present appeal, we fail to discern any multiplicity of errors that would render Laupp's trial fundamentally unfair.

Accordingly, the judgment of the Boone Circuit Court is affirmed.

All sitting. All concur.

COUNSEL FOR APPELLANT:

John Gerhart Landon
Landon Law, PLLC

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Joseph A. Beckett
Assistant Attorney General